## REDMAN BROTHERS v. MAYS.

Where specific performance is sought for the enforcement of a parol contract for the sale of lands, such contract and the terms thereof should be established so clearly, strongly, and satisfactorily as to leave no reasonable doubt as to the agreement; and the evidence in this case, in clearness, strength, and precision, failing entirely to measure up to this standard, the court did not err in setting aside the verdict for the plaintiff and granting a new trial.

Submitted June 24,—Decided November 13, 1907.

Complaint for land. Before Judge Reagan. Butts superior court. March 30, 1906.

Redman Brothers brought an action against Mays, and alleged, that during the year 1897 the plaintiffs purchased from Barnes & Sanders one engine and sawmill, together with a tract of land fifty yards square, on which to erect and maintain a gin-house and yard; that they paid Barnes & Sanders the purchase-price of said land and machinery, viz.: $300; that Barnes & Sanders have failed to make and deliver to petitioners a deed to said property, though often requested by petitioners to do so; that petitioners erected improvements on said land of the value of $450; that in October, 1899, Barnes & Sanders executed and delivered to G. P. Sanders, a brother of Sanders of the firm of Barnes & Sanders, a deed to the above-mentioned property, and in October, 1903, G. P. Sanders conveyed said property to the defendant, Mays; that G. P. Sanders and Mays accepted said deeds "with full notice of plaintiff's equities in said land, plaintiff being continuously in possession thereof; and that said deeds were executed and accepted with full knowledge of all the facts, and for the sole purpose of defrauding your petitioner; and that said Mays, G. P. Sanders, and Barnes & Sanders conspired and colluded to defraud your petitioner out of said premises." It is also alleged that during the spring of 1905, the defendant entered upon said land and removed all of the buildings erected there by the plaintiffs. Wherefore it is prayed that the plaintiffs "have judgment against said Mays for the premises in dispute," and for damages sustained by reason of the removal of said buildings by the defendant. The defendant in his answer denies the material averments of the petition, and alleges that he is the lawful owner of the premises in dispute, under the deeds from Barnes & Sanders to G. P. Sanders, and from G. P. Sanders to the defendant. The case was regularly submitted to a jury, and a verdict was returned in favor of the plaintiffs. The defendant moved for a new trial, upon numerous grounds. The court sustained the motion, and ordered that a new trial be granted. This was the second grant of a new trial. The plaintiffs excepted.

*C. L. Redman* and *O. M. Duke,* for plaintiffs.

*Ray & Ray, H. M. Fletcher,* and *John R. L. Smith,* for defendant.

Beck, J.　(After stating the facts.)

1.　In the case of *Printup* v. *Mitchell,* 17 *Ga.* 558, it is said, "A parol contract for land, like the reformation of a deed by parol proof, should be made out so clearly, strongly, and satisfactorily as to leave no reasonable doubt as to the agreement. It is a serious matter to substitute a parol sale of real estate for a deed." In the case of *Dwight* v. *Jones,* 115 *Ga.* 744, it is said that the rule just announced above is well settled. See also 26 Am. & Eng. Enc. Law (2d ed.), 130. The evidence in this case fails entirely to measure up to this standard of strength and clearness. In the petition as originally filed, it will be observed that the plaintiffs alleged a contract for the purchase of a lot of land described as follows: "A sufficient amount of land to erect a gin-house and yard therearound. Said premises being situated at Stark, Ga., in Butts Co., and bounded north by lands of J. A. Dodson, east by the Hoard estate, south by public road leading from Dempsey's ferry to Jackson, Ga., west by road leading from said gin-house to Macedonia colored church. Said land being the land upon which said firm of Redman Bros. erected and operated a public gin during the years 1897, 1898, 1899. Said land containing forty yards square." Subsequently, by way of amendment, they alleged, "that the tract of land described in original petition is more fully described as follows: Bounded on the north by lands now owned by J. A. Dodson, east and south by lands of R. W. Mays, and west by road leading from public road to negro church; and that said tract or parcel of land contains 50 yards fronting road to negro church, and running back east 40 yards, being 50 x 40 yards, and that wherever it appears on original declaration 40 yards square it be made to read 50 yards square." Giving effect to the last averment in the amendment, it would seem that the plaintiffs were seeking to recover a lot fifty yards square. And inasmuch as the verdict was for the premises in dispute, the jury must have intended to find that the plaintiffs were entitled to a decree for the specific performance of a contract of sale of a lot of land of those dimensions. That finding is without evidence to support it, as will be seen from an examination of the testimony relating to the terms of the contract, the interest bought, and the dimensions and description of the lot alleged to have been purchased.

The testimony upon these points is in substance as follows: T.

E. Redman testified: "I owned jointly with Barnes & Sanders some machinery [sawmill and outfit]. I owned one third and they owned two thirds. . . We decided to move to Stark on their own one-acre lot, to put up a ginnery. . . I remarked to Charlie [Sanders of the firm of Barnes & Sanders], 'You know I have got no deed to that lot we are going to erect this ginnery on,' and Charlie remarked, 'That is all right; you will own one third interest in it;' and [being brothers-in-law] I had the utmost confidence in him. . . He then sold out to [J. C. Redman, the other member of the firm of Redman Brothers] with the same understanding, that the land was to go with the machinery. . . When they [Barnes & Sanders] were preparing to lay the foundations of that building [a warehouse], they had us to come out there. . . They wanted to know if that would give us room enough for that gin-house lot, and we told them it would. . . I don't remember whether we stepped it or not. . . I never did step the width of it until this suit was brought. I stepped it from the negro church road back to the warehouse. It was forty steps from the negro church to the warehouse. It was about forty-five or fifty feet across. We bought the entire width of the lot running up to that warehouse. I knew we bought enough land for them to put up that house [gin-house 24 x 36 feet, with boiler-room 24 x 24 feet, and seed-room 14 x 16 feet]. I did not know how much we bought from them by actual measurements. I think I did swear last February we bought forty yards square. I stepped it. I knew it was forty yards, forty steps. I stepped it from that warehouse back to the road leading to the negro church; and as to the exact width of that lot, we were to have the entire width of it, but we never did measure it. I did swear positively in February we bought forty yards square. I only stepped it. When it comes to actual measurement, I never did know. I bought this land we were talking about in May, 1897. I bought it from C. W. Sanders. My brother John bought their two-thirds interest. . . They sold brother John their two-thirds interest. The machinery was all on the land. We paid them $350 for this property. That is, brother John, his part was $350; that included the machinery, the two-thirds interest, the land and all. I made the trade in May, 1897. There was no one present but Charlie Sanders. I did not buy any land at that time. He told me I would own one-third

interest in it, just the same as he and Homer [Barnes]. We paid Barnes & Sanders $415, including the land and the two-thirds interest. We did not have any understanding when we made the trade as to when we were to pay this money. The purchase-price was $350. The reason we paid $415, we had gone ahead paying these different items, and I found we had paid more than we had promised to pay, and after doing that I went to Charlie and Homer [Barnes & Sanders] and asked them for the deed. . . It was the understanding between Barnes & Sanders and ourselves that this amount would go in payment of that gin-house and the land around there." J. C. Redman testified: "I purchased some machinery from Barnes & Sanders, . . also some land, the west end of the storehouse lot of Barnes & Sanders. T. E. Redman also owned an interest in said machinery. I bought the west end of the storehouse lot at Stark, Ga., 40 yards square. Redman Bros. purchased from Barnes & Sanders the land described in the interrogatories [this description does not appear anywhere in the record]; the purchase-price was $350." L. F. Redman testified that in August, 1899, he heard Tom Redman demand, and Barnes & Sanders promise, to make "a deed to the property on which they [Redman Bros.] had built a gin," the land referred to being the land "upon which the gin of Redman Bros. was built in the rear of the store of Barnes & Sanders." C. L. Redman testified, that Barnes & Sanders promised to make a deed in favor of Redman Bros. "to that land out there." Also, "I was there when these premises were measured from the road up to the warehouse. Charlie Sanders discussed with Mr. Redman if that would give them plenty of room. That is the reason he measured it, in order to get it off the gin-house lot."

Sufficient cause for the grant of a new trial being found in the general grounds of the motion, we have not thought it necessary to decide the specific assignments of error, assuming that if there were errors in the charge of the court and the admission of evidence, the court will correct such errors upon the next trial, in case the same questions should then be raised.

*Judgment affirmed. All the Justices concur, except Holden, J., who did not preside.*